# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION  II

| | |
|---|---|
| THOMAS W.M. STOUT, | No.  59373-4-II |
| Appellant, | |
| v. | UNPUBLISHED OPINION |
| STATE OF WASHINGTON, DEPARTMENT OF CHILDREN, YOUTH, AND FAMILIES, and GREEN FELIX & "JOHN DOE" FELIX, Husband and wife, and AURRA GADWAY, & "JOHN DOE" GADWA, husband and wife, | |
| Respondents. | |

PRICE, J. — In September 2016, K.S. allegedly reported to her school counselor that she was afraid of returning home because of a violent argument the previous evening between her father, Thomas E.M. Stout, and her father's live-in partner.  As a result of K.S.'s report, Department of Children Youth and Families (DCYF) social workers went to Stout's home to investigate the potential abuse and neglect of Stout's children K.S. and H.S.  The social workers' visit to Stout's home was contentious.  At some point, Stout told the social workers to leave his property.  The social workers refused, expressing concerns that Stout was intoxicated and that they feared that he had plans to drive with K.S. in his car later that evening.  Stout denied being intoxicated and continued to demand that the social workers leave.

While many of the facts that follow are disputed, both parties agree that after repeated demands for the social workers to leave, Stout eventually attached a chain to the social workers' vehicle and forcibly dragged it from his property.

Law enforcement eventually arrived and arrested Stout. Stout's children were removed from his custody. Over the next few years, dependency proceedings occurred, and Stout eventually lost custody of his children in 2020.

Stout subsequently sued the State, DCYF, and the investigating social workers (collectively DCYF), alleging that DCYF had intentionally lied in its investigation and subsequent dependency petition and the loss of his children resulted. His complaint included six different claims: (1) negligent investigation, (2) malicious prosecution (three instances), (3) intentional trespass, (4) negligent supervision, (5) interference with family relations, and (6) outrage.

DCYF moved for summary judgment, arguing that even construing the facts in a light most favorable to Stout, he could not make out prima facie cases for any of his claims. The superior court agreed and dismissed Stout's complaint with prejudice.

We affirm the superior court.

FACTS

I. BACKGROUND

A. INITIAL DCYF INVESTIGATION

On September 29, 2016, Stout's live-in partner, Andie Paré, argued with Stout. Paré became intoxicated and broke dishes, shattered the home's sliding glass door, and shot a firearm multiple times on the property. Eventually Stout called the police, and Paré was arrested. Stout's

children, K.S. and H.S. (whom he shared with his ex-wife Mary), did not actually watch Paré's conduct, but they were present at the home during the incident and overheard the argument as well as the gunshots.

The next day at school (September 30), K.S. and H.S. explained what had occurred to their school counselor, Rebecca Roberts. After hearing their reports, Roberts called Stout. During the call, Roberts became concerned by how Stout appeared to be "minimizing" the events from the night before, so she reported the children's story to child protective services. Clerk's Papers (CP) at 247, 258.

Later the same day, DCYF social workers, Geene Felix and Aura Gadwa, came to the school and interviewed K.S. Based on the interview, Felix and Gadwa decided to conduct an additional investigation at Stout's home. While Roberts rode the bus home with K.S. and H.S., Felix and Gadwa drove to Stout's property in their state vehicle.

After arriving at Stout's home, Felix and Gadwa spoke with him about the incident the previous night. The discussion did not go well. Both Felix and Gadwa felt Stout was hostile and believed him to be drunk. This made the social workers concerned about the safety of the children. And they had the immediate concern that Stout might attempt to drive K.S. to an activity later that evening while he was intoxicated. They proposed a "safety plan" to Stout, suggesting that he have a different family member drive K.S. or that he allow the children to stay with other family members for the weekend. CP at 430.

This caused Stout to become agitated, and he asked Felix, Gadwa, and Roberts to leave. They refused and attempted to reason with Stout, but Stout became more agitated by their refusal. Stout called law enforcement to report that the social workers were trespassing on his property.

At that point, Felix, Gadwa, and Roberts called law enforcement themselves and left the home, but they remained parked in the state vehicle at the end of Stout's driveway. Stout asked them to leave again, but they still refused, saying that they wanted to be able to maintain a view of K.S. and H.S., who were standing outside the house. Stout, angry that the social workers and Roberts would not leave his property, proceeded to back his truck out, narrowly missing the state vehicle. He positioned his truck behind the state vehicle, blocking them in. Stout then attached a chain to the state vehicle and dragged it off his property with the three women still inside.

After Stout dragged the state vehicle out of his driveway, Felix drove Gadwa and Roberts to Stout's neighbor's property owned by Linda McConaghy-Fuhr. While they were parked at McConaghy-Fuhr's property, Stout approached their vehicle carrying his phone in one hand and a "metal object" in the other. CP at 437. Fearing that Stout had a gun, Felix sped out of McConaghy-Fuhr's driveway and waited for law enforcement to arrive some distance away. Some of the interaction was captured on video surveillance cameras located on Stout's and McConaghy-Fuhr's property.

B. STOUT'S ARREST AND CRIMINAL CHARGES

Law enforcement later arrested Stout and booked him into Mason County Jail. The sheriff's declaration of probable cause stated that, based on the statements obtained from Felix and Gadwa at the scene as well as the information they received from 911 operators, there was probable cause to arrest Stout for three counts of unlawful imprisonment for preventing Felix, Gadwa, and Roberts from leaving his property, and two counts of intimidating a public servant for his conduct with Felix and Gadwa.

4

The declaration of probable cause specifically alleged that Stout had threatened Felix by punching her and ramming her with his car as she, Gadwa, and Roberts attempted to leave his property, had blocked them in and prevented them from leaving, had subsequently dragged their car off his property, and had come towards the car in a "threatening/aggressive manner" while "cussing and yelling" and "displaying a firearm." CP at 41.

Stout was charged with the five counts alleged in the information. However, the State later dismissed Stout's case without prejudice based on a lack of sufficient evidence to proceed to trial.

C. SUBSEQUENT DEPENDENCY AND ADMINISTRATIVE PROCEEDINGS

1. Dependency Proceedings

On October 4, 2016, four days after the September 30 incident, Felix filed a dependency petition for K.S. and H.S.[1] The petition detailed Felix and Gadwa's findings from their five-day investigation, alleging that K.S. and H.S. were "abused or neglected," "ha[d] no parent, guardian, or custodian capable of adequately caring for [them]," and were living in "circumstances which constitute a danger of a substantial damage to [their] psychological or physical development." CP at 246, 257.

The next day, on October 5, the juvenile court held a shelter care hearing on the matter during which the court found that it was against the best interests of K.S. and H.S. to return home with Stout. The court checked the boxes for the following findings in its order:

---

[1] Felix filed two separate petitions, one for each child. However, because the petitions are nearly identical this opinion will refer to them as a singular petition.

[X] [Felix] made reasonable efforts to prevent or eliminate the need for removal of the child from the child's home. For the reasons set forth in the dependency petition, supporting declarations and affidavits, and/or the testimony presented to the court:

[X] The risk of imminent harm to the child as assessed by [Felix] establishes reasonable cause for the continued out-of-home placement of the child pending the fact finding hearing;

CP at 269, 281. Stout did not contest the shelter care findings and stipulated to the order.

In July 2017, Stout agreed to the dependencies of K.S. and H.S. Although Stout agreed that "the Court would find that a preponderance of the evidence supports a finding that the child is dependent," and that "his family could benefit from the ordered services," he still disputed the dependency petitions findings. CP at 125.

About a year later, Stout moved to regain custody of K.S. and H.S. The juvenile court denied this motion due to Stout's "lack of progress" with the services necessary for him to regain custody of his children. CP at 120. The dependency proceedings were eventually dismissed in December 2020 after the children were placed with their mother, Mary.

2. Administrative Proceedings

In a separate, but related, matter, DCYF issued Stout a letter about three weeks after the incident on his property (October 14, 2016), stating the department had found that Stout had committed negligent treatment or maltreatment of K.S. and H.S. Stout eventually appealed DCYF's findings to the Office of Administrative Hearings.

In May 2017, Stout moved to stay DCYF's findings pending an administrative hearing. He argued that as a consequence of the findings, he had been unable to work as a licensed practical nurse (LPN) because nursing homes and assisted living facilities may not employ persons with

DCYF findings of abuse or neglect unless those findings are reversed by an Administrative Law Judge (ALJ). DCYF offered to not oppose Stout's motion for a stay if Stout agreed to the dependencies of K.S. and H.S. Stout accepted this offer in July 2017. Thus, with no opposition from DCYF, the ALJ granted Stout's motion to stay the findings. DCYF changed the notation in their electronic system about Stout to be "unfounded" while Stout's administrative appeal was pending. CP at 93.

About two years later, Stout and DCYF reached an agreement that if he withdrew his request for an administrative hearing, DCYF would permanently change its findings to "unfounded."

## II. STOUT'S COMPLAINT AGAINST DCYF

In January 2020, Stout filed a civil complaint against the State, DCYF, Felix, and Gadwa. The complaint alleged that Felix and Gadwa had intentionally lied about what had occurred in their investigation on September 30, 2016, and that Stout's children had been wrongfully removed from his custody. Based on these alleged lies, Stout contended that DCYF was liable for negligent investigation, negligent supervision, intentional trespass, interference with family relations, and outrage. He also alleged three claims of malicious prosecution, one claim each for his criminal prosecution, the dependency proceedings, and the administrative proceedings.

## III. DCYF'S MOTION FOR SUMMARY JUDGMENT AND SUPPORTING EVIDENCE

DCYF filed a motion for summary judgment. The department argued that Stout's lawsuit was precluded by collateral estoppel because he had agreed at the October 5 shelter care hearing to a dependency of his children and that "each of his causes of action are all necessarily premised

on the events leading up to the shelter care and dependency, including [DCYF's] investigation on September 30, 2016 and the dependency petition." CP at 57.

DCYF argued that even if Stout were not collaterally estopped from bringing his action, Stout could still not "show each legal element necessary" to prove any of his causes of action. CP at 53. Along with its motion, DCYF submitted a copy of the dependency petition, multiple declarations, and additional supporting documentation. DCYF's evidence included the dependency petition Felix filed following their investigation as well as excerpts from Felix, Gadwa, and Stout's depositions.

## A. OCTOBER 2016 DEPENDENCY PETITION

DCYF submitted a copy of the dependency petition filed on October 4. The factual assertions in the petition were declared as true and correct under penalty of perjury by Felix. The petition was consistent with the above-stated facts, but it included more detail about DCYF's conduct and motivations during its five-day investigation from September 30 to October 4.

The petition explained that the social workers were assigned to investigate after K.S.'s and H.S.'s reports to their school counselor, Roberts, on September 30. K.S. and H.S. had "expressed concern" to Roberts "about returning home," and they told her about Paré's arrest the night before. CP at 247, 258. The social workers began their investigation by interviewing K.S. and Roberts at the school to learn more about what had happened.

The petition alleged that K.S. reported that when she had come home from cheerleading practice the night before "Mr. Stout and Ms. Par[é] had been drinking alcohol" and she had "heard [them] arguing about her mother, [Mary]." CP at 247, 258. K.S. put herself to bed, but at around

8

1:00 a.m., she was awoken by "a door slamming, more yelling[,] and gun shots." CP at 247, 258. The petition stated that at this moment,

> [K.S.] reported her heart was pounding, she was shaking and crying but she stayed in her room terrified. She reported she was so scared she could not move. [K.S.] reported lying in bed thinking her dad was dead because of the gun shots.

CP at 247, 258. K.S. reported there was "glass everywhere inside and outside of the home," "all the dishes in the home had been smashed," and there were "bullet holes in the truck and windshield." CP at 247, 258.

Felix and Gadwa drove to Stout's residence to further investigate the allegations. Roberts rode with K.S. and H.S. on the school bus because K.S. was "scared about . . . returning to the family home." CP at 247, 258. Upon arriving at the residence, K.S. and H.S. "were excited to show [Felix and Gadwa] the bullet holes in two trucks parked at the top of the driveway." CP at 248, 259.

The petition stated that when the social workers met Stout at the property, he "smelled of alcohol," and he admitted that he had been drinking when asked by Gadwa. CP at 248, 259. The petition described Stout as "aggressively postured . . . toward [Felix and Gadwa] by using a raised voice, swearing at [them], and acting hostile." CP at 248, 259.

The petition stated that while Felix inspected the area outside the house, K.S. told her, " 'Don't leave me' " and further said that "she didn't want to be alone with her father or in the home." CP at 248, 259.

Throughout the investigation, Stout "kept screaming at the children to tell [Felix and Gadwa] they were not afraid of him. The children initially did not respond and [K.S.] started crying." CP at 248, 259. The petition described,

> When []Felix and [K.S.] came back out front on the deck of the home Mr. Stout was standing there smoking a cigarette and began screaming again that there were no bullet holes in the house and the glass was picked up. Mr. Stout was screaming at the children to tell the social workers they were not afraid of him. [K.S.] began to cry and hyperventilate. [Felix] stopped and tried to calm [K.S.] down. While this was occurring Mr. Stout kept screaming "Tell the [social worker] you aren't afraid of me." [K.S.] looked at [Felix] and quietly went to her father. Once [K.S.] went to her father Mr. Stout directed [Felix] to leave his property but [K.S.] looked up at [Felix] with tears in her eyes and shook her head no.

CP at 248, 259.

Eventually Stout calmed down and "agreed to show [Felix] the inside of the home." CP at 248, 259. He showed Felix "a large gun safe and indicated it was full of weapons and there was a handgun in the nightstand next to the bed." CP at 248, 259.

The petition described Stout as "still reeking of alcohol" when he eventually asked Felix and Gadwa to leave because he had to take K.S. to a cheerleading event. CP at 249, 260. When Felix and Gadwa questioned his ability to drive, the petition stated that Stout became "enraged" and started "screaming" at Felix. CP at 249, 260. As Felix and Gadwa "attempted to reason with [him]," Stout called the police. CP at 249, 260.

> While waiting for the police to come, Mr. Stout continued to scream at []Felix. The children were sitting on the deck with [Roberts] and were both crying while []Felix attempted to ask Mr. Stout to call his sister or his mother for assistance with the children for the weekend. Mr. Stout got inches away from []Felix's face and screamed even louder he was going to punch []Felix "in the pie hole."

CP at 249, 260. The petition stated that Stout eventually "consented" to allowing Felix, Gadwa, and Roberts to wait in their car at the end of his driveway for law enforcement to arrive so that they could maintain a view of K.S. and H.S. CP at 249, 260.

The petition then went on to describe that while Felix, Gadwa, and Roberts waited, Stout came down the driveway and demanded that they leave or else he would "ram" them with his truck off the property. CP at 249, 260. When they refused to leave,

> Mr. Stout walked away . . . and went to his truck and removed a large industrial chain. He got into the truck and drove down the driveway narrowly missing [their] vehicle. . . . He then blocked the driveway so [Felix, Gadwa, and Roberts] could not leave the property and attached a chain to the back of the state vehicle. Mr. Stout then got back into his truck and drug [them] in their vehicle approximately 20 feet off the property.

CP at 249, 260. The petition also stated that right before Stout towed the car off the driveway, "Felix looked up the driveway and saw the children huddled and cowering next to the other truck." CP at 249, 260. A neighbor then "came running down the driveway stating the children were safe in her home." CP at 249, 260.

Felix and Gadwa moved their car to the neighbor's (McConaghy-Fuhr's) driveway. The petition stated that while they were parked there, Stout approached their state vehicle, "talking on his cell phone and holding a gun in the other hand." CP at 249, 260. The social workers immediately left the property until they met with law enforcement.

After leaving McConaghy-Fuhr's property, Felix and Gadwa interviewed Paré's sister, Cheri Jameson (formerly Cheri Verman). The petition described Jameson as having been "excited" to see that Felix and Gadwa were okay "because she had been on the phone with Mr. Stout when he reported to her that he had a gun and was going [to] hurt [Felix and Gadwa]." CP at 250, 261.

11

According to the petition, Jameson told the social workers that she had been to Stout's home earlier that morning and that Stout had already been drinking and intoxicated. She also said that she had needed to clean up all of the glass in the house because Stout had refused.

## B. EXCERPTS OF DEPOSITION TESTIMONY FROM FELIX AND GADWA

DCYF also submitted as part of its motion for summary judgment excerpts from the depositions of Felix and Gadwa (taken after the October 4 petition was filed) during which they provided testimony that was largely consistent with the allegations in the dependency petitions.

In her deposition, Gadwa added that she believed that K.S. and H.S. "were afraid of [Stout's] behavior." CP at 79. She explained, "You could see reactions on both of their faces and the way they twist their little hands and it makes them nervous" and theorized that K.S. and H.S. "had experienced that type of stuff before." CP at 79.

Felix and Gadwa both remembered that they had fled from Stout's property because Gadwa had thought she had seen Stout approaching with a gun. But during their depositions, they also reviewed video footage (without audio) of the incident taken by surveillance cameras on Stout's property and McConaghy-Furhr's property. And in reviewing video footage of the incident, Gadwa explained her thought process during the incident.

> [Stout's attorney:] So he's coming out of the door. He's got his phone up to his ear. . . . And he's walking across his deck. And do you—can you see that he has something in his right hand?
>
> [Gadwa:] In that video, I can see that, yes.
>
> [Stout's attorney:] And what is it? ·
>
> [Gadwa:] I don't know what it is.
>
> [Stout's attorney:] It's a gun isn't it?
>
> [Gadwa:] I don't know what is in his hand right there. I can only tell you—

. . . .

> I can only tell you what I believe to be in his hand from a distance. I didn't have this view that day. I can only go with what I knew and what I reasonably believed to be true.

CP at 84. Still, Felix and Gadwa both admitted after watching the video footage that what Stout was holding could have been part of the lock or some other metal object. Nevertheless, both insisted that when the incident was actually happening, they believed that Stout had a gun. Felix described that she felt "afraid" and "terrified." CP at 308. Gadwa explained,

> [Stout] went back in his house. He came out with a silver object in his hand. He's marching straight towards our car. He's angry. He's already tied a chain to us. I have every reason to believe that he wants to harm us.
>
> His children have now run to the neighbors. For all I know, he went into the house and found out they were gone, upset, angry, drunk, coming down the driveway with a gun to threaten us again. All of those things were possible in my mind at that moment. That was real to me, very real.

CP at 86-87.

C. EXCERPTS OF DEPOSITION TESTIMONY FROM STOUT

In support of its summary judgment motion, DCYF also attached excerpts from Stout's deposition. In those excerpts, Stout admitted that during his interactions with Felix, he had told her to "shut her f***ing pie hole;" however, he denied ever threatening Felix.

Stout also said that he had a conversation with Felix and Gadwa about whether he was sober enough to drive K.S. to cheerleading practice. He could not remember the exact words that were said, but he remembered that they had asked him if his mother or sister could come to the home to help him or if the children could stay with them for the weekend.

Stout described the moment when Felix and Gadwa quickly left from McConaghy-Fuhr's driveway.

13

[DCYF attorney:] You said they backed out in Mach speed. They backed out of [your neighbor's] driveway really fast?

[Stout:] Yes, they backed out and took off towards the south.

[DCYF attorney:] Did it occur to you, in retrospect, that they did that because they were scared of something?

[Stout:] Well, knowing what they think they saw, yeah. Now I mean, hindsight is 20/20. But at the time, no, I thought they were half nuts.

CP at 331.

IV. STOUT'S RESPONSE AND SUPPORTING EVIDENCE

In his response to the summary judgment motion, Stout detailed how he met the elements for each of his claims. Attached to his response, he filed his own declaration, as well as declarations from his neighbor, Linda McConaghy-Fuhr, and Paré's sister, Cheri Jameson.

A. DECLARATION OF STOUT

Stout's declaration gave a different account of DCYF's investigation and subsequent dependency proceedings. He challenged multiple assertions made by DCYF.

Stout first challenged DCYF's allegation that K.S. and H.S. "were fearful about returning home from school" the day after Paré's arrest. CP at 429. He stated that "[n]either of the children had indicated to [him] that they were fearful while at the school bus stop, nor did they present as fearful upon their return home from school." CP at 429.

Stout also stated that during a forensic interview, K.S. had denied being afraid of him and had said that the social workers "confused" her and "made her say that she was afraid." CP at 429. He also said,

> At no time did I witness K.S. look at Ms. Felix with tears or shake her head no to my demand that the Social workers leave the property and await law enforcement. Fact, when Social workers began to retreat to their vehicle, both K.S. and H.S. came to me and embraced me in relief that Social workers were leaving.

14

CP at 434. According to Stout, H.S. similarly had denied being afraid of Stout during a recent

deposition.

Stout then denied DCYF's allegations that he had been intoxicated during the September

30 incident. He said,

> I was not, nor had I made any acknowledgment to the social workers that I had been drinking prior to their arrival at my home. In fact, I not only requested a BAC test from the Social workers, I also requested a BAC test from law enforcement and was never afforded one to prove my lack of intoxication. Multiple witnesses, including the children denied that I appeared to be intoxicated. The Social workers claimed that there was concern of me driving, however after I called 911 to report the trespass of the Social workers, the concern of me driving should have been alleviated as I stated that I was going to await the arrival of law enforcement.

CP at 430. Stout also denied ever telling Felix or Gadwa that he had planned to drive K.S.

anywhere that evening.

Stout next stated that "Felix never asked if they could sit in their vehicle with a vantage

point to still see the children" and that he had never agreed to allow the state vehicle to remain

parked in the driveway. CP at 434. He said he had been "perfectly clear" that he wanted them to

leave the property. CP at 434. When Felix refused to leave, Stout admitted that he told her that

he would "drag" the car off the property, but he denied threatening to "ram" the car. CP at 435.

> At no time did I ever state that I would "ram" them. My intent is made clear by my action after Ms. Felix stated "well go ahead then" in response to me telling her I was going to drag them. The action I refer is of me entering the bed of my truck and removing a chain from the toolbox. A chain is not needed to "ram" a vehicle.
>
> . . . .
>
> While Social worker Gadwa continues to contend that I in fact did ram the State vehicle, I did no such thing. This motion clarifies that I "narrowly missed hitting the State vehicle." This is corroborated in my surveillance video. While man[eu]vering around the State vehicle it is true that I broke off the driver[']s side mirror of my personal vehicle on my gate. I elected to sacrifice my mirror

15

specifically to avoid striking the State vehicle with my truck. At no time did I make direct contact with the State vehicle with my truck.

CP at 435-36. Stout also stated that a photo taken of K.S. and H.S. shows that they were not "huddled in fear" as this was happening. CP at 435.

Stout flatly denied that he had approached Felix and Gadwa's vehicle with a gun. Instead, he said that he had been merely holding a "metal object." CP at 437.

B. STATEMENTS FROM LINDA MCCONAGHY-FUHR

Stout also attached sworn statements made by his neighbor, McConaghy-Fuhr, including excerpts from her deposition as well as a declaration that she had previously submitted as part of his dependency case.

McConaghy-Fuhr said that in her time knowing Stout and his children, she had never known K.S. and H.S. to be afraid of Stout. At the time of the September 30 incident, she was home when K.S. and H.S. arrived at her house. She described K.S. and H.S. as "upset and crying." CP at 418. When she had asked K.S. what was wrong, K.S. had said that "they're trying to say I'm afraid of my daddy but I'm not." CP at 418.

McConaghy-Fuhr also described a conversation that she had had with Felix and Gadwa following Stout's arrest. She remembered that Felix and Gadwa had asked her what Stout did for a living. When McConaghy-Fuhr responded that Stout was a nurse, the social workers responded, "Oh, he won't be one anymore," and then they "just started laughing at the top of their voices." CP at 405. McConaghy-Fuhr described how the social workers "got great enjoyment" out of the idea that, because of their investigation, Stout "would not have a job being a nurse whatsoever anymore." CP at 405.

16

McConaghy-Fuhr also recalled that she had seen Stout when he had approached Felix, Gadwa, and Roberts in the state vehicle and that she never observed him having had a gun. When McConaghy-Fuhr told this to Felix and Gadwa, she remembered that one of them had agreed with her but that the other one had disagreed and insisted that Stout had indeed had a gun. McConaghy-Fuhr said that the social worker who had claimed to have seen a gun became "worked up," "insistent," and "adamant" that Stout had a gun and that Stout was going to go to jail. CP at 405-06. After this interaction, McConaghy-Fuhr stated that she walked away because there was "nothing else" she could say. CP at 406.

C. DECLARATION OF CHERI JAMESON

Stout attached a sworn declaration from Paré's sister, Cheri Jameson, that had been submitted during Stout's dependency case. In her declaration, Jameson claimed that there were multiple inconsistencies between what she had actually told Felix on September 30 and what Felix had written in the dependency petitions.

Jameson first took issue with the petition's statement that she had been " 'excited' " to see that Felix and Gadwa were okay. CP at 413 (quoting CP at 250, 261). She denied that Stout ever told her that he had a gun or that he had plans to hurt Felix and Gadwa, and she had "no [other] reason to believe that they had been in any danger from Mr. Stout." CP at 413.

Jameson also said that "at no time did [she] perceive that Mr. Stout had been drinking at all" and denied telling Felix that he had been intoxicated. CP at 413. Jamson also said that rather than refusing to clean up the glass, Stout had told her that morning that "he had to clean up the glass for the safety of the children and the animals." CP at 414.

V. STATE'S MOTION TO STRIKE

Following Stout's response to DCYF's summary judgment motion, DCYF moved to strike multiple portions of Stout's declaration asserting that they were hearsay, were legal conclusions, were conclusory or speculative, or lacked foundation.

At the summary judgment hearing, DCYF explained that it was asking the superior court to "either strike or not consider" these portions of Stout's declaration. VRP (Jan. 26, 2024) at 15. DCYF stressed that it simply wanted to make sure that these portions of the declaration were not considered and that it was "comfortable" with the court striking the improper portions or just informally choosing not to consider them. VRP (Jan. 26, 2024) at 15.

The superior court denied DCYF's motion to strike. While the court acknowledged that "the declaration . . . include[d] material that [was] not appropriate or helpful to the court in ruling on th[e] motion for summary judgment," it ultimately declined to strike "any portions of declarations." VRP (Jan. 26, 2024) at 39. The superior court explained,

> The court is well aware of the requirements for admissible evidence in consideration for a motion for summary judgment. It is inappropriate for the court to rely on generalized statements that are not particular, that are unsupported, and the court has considered all of those arguments with regard to the evidence, but I'm not striking any declarations or portions of the record.

VRP (Jan. 26, 2024) at 40.

VI. SUPERIOR COURT'S DECISION ON SUMMARY JUDGMENT

The superior court granted DCYF's motion for summary judgment and dismissed Stout's claim with prejudice based on its review of the parties' arguments and the evidence.

The superior court declined to bar all of Stout's claims based on collateral estoppel. The court acknowledged the relevance of the dependency and shelter care proceedings, but it

apparently chose to consider this evidence for the purposes of reviewing Stout's claims on the merits, not for purposes of collateral estoppel. The court explained:

> It appears to me that that issue of collateral estoppel is raised as an issue that would preclude all of the plaintiff's claims. The court is denying the invitation to rely on collateral estoppel to preclude all of the plaintiff's claims. I believe that it is appropriate for the court to consider the orders on shelter care and dependency and the agreement of the plaintiff as to particular orders of the court, and that is relevant as to some of the claims, but the court is declining at this time to rely on collateral estoppel to dismiss each of the plaintiff's claims.

VRP (Jan. 26, 2024) at 40.

In deciding the case based on the evidence, the superior court told the parties that it had reviewed "every document filed in the court file" including screen shots of video footage capturing Stout's interactions with the social workers in September 2016, as well as declarations that referenced that footage. VRP (Jan. 26, 2024) at 5. The superior court had not, however, reviewed the video footage submitted by the parties because it said that the clerk's office did not readily accept non-paper documents for motion hearings.[2] DCYF and Stout agreed to proceed with the summary judgment proceeding without the judge having reviewed the videos.

Following the argument of the parties, the superior court granted DCYF's motion for summary judgment and dismissed Stout's complaint in its entirety.

Stout appeals.

ANALYSIS

Stout's complaint lists six different types of claims: (1) negligent investigation, (2) malicious prosecution (three instances), (3) intentional trespass, (4) negligent supervision,

---

[2] Because these files were never accepted by the superior court, they are not included in our record on appeal.

(5) interference with family relations, and (6) outrage. Stout argues that the superior court erred when it granted DCYF's motion for summary judgment because when the facts are construed in a light most favorable to him as the nonmoving party, he had successfully established a prima facie case for each one of his causes of action.[3]

DCYF responds by contending that the superior court correctly dismissed Stout's claims. DCYF also cross-appeals the superior court's denial of its motion to strike portions of Stout's declaration. We affirm the superior court, and we reject DCYF's cross-appeal.[4]

I. STANDARD OF REVIEW

We review a superior court's dismissal on summary judgment de novo. *Galassi v. Lowe's Home Centers, LLC*, 4 Wn.3d 425, 434, 565 P.3d 116 (2025). Summary judgment may be granted

---

[3] Stout also contends that the superior court erred by dismissing his claims based on collateral estoppel. We disagree that the superior court's decision was based on collateral estoppel. While it appeared that the superior court believed that collateral estoppel may have been "relevant" to some of Stout's claims, it specifically declined to decide summary judgment on that basis. VRP (Jan. 26, 2024) at 40, 42. ("The court is denying the invitation to rely on collateral estoppel to preclude all of the plaintiff's claims."). On appeal, DCYF does not argue that collateral estoppel applies. Accordingly, we decline to decide this case based on collateral estoppel.

[4] While DCYF is correct that at summary judgment the court cannot consider evidence that is hearsay or is conclusory, speculative, or lacked personal knowledge, the department cites no authority that a court was *required* to strike such evidence from the record. *See DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962) ("Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none."). As acknowledged by DCYF during the hearing below, it was appropriate for the court to "either strike or not consider" any inadmissible evidence. VRP (Jan. 26, 2024) at 15. And in our review of the record, it appears that the superior court based its decision only on what was admissible and avoided reliance on "generalized statements that are not particular" or that are unsupported. VRP (Jan. 26, 2024) at 40. We acknowledge that Stout's declaration includes inadmissible and conclusory statements, and we similarly based our decision only on admissible evidence.

if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); *Meyers v. Ferndale Sch. Dist.*, 197 Wn.2d 281, 287, 481 P.3d 1084 (2021). When reviewing a decision on summary judgment, we view all facts in the light most favorable to the nonmoving party. *Galassi*, 4 Wn.3d at 434.

Summary judgment follows a burden-shifting structure. *See id.* The moving party bears the initial burden of proving " 'by uncontroverted facts' " that they are entitled to a judgment as a matter of law. *Bittner v. Symetra Nat'l Life Ins. Co.*, 32 Wn. App. 2d 647, 660, 558 P.3d 177 (2024) (internal quotation marks omitted) (quoting *Welch v. Brand Insulations, Inc.*, 27 Wn. App. 2d 110, 115, 531 P.3d 265 (2023)). "When the moving party is the defendant, it may meet its burden of showing there is no dispute of material fact by 'pointing out that there is an absence of evidence to support an essential element of the plaintiff's claim.' " *Beauregard v. Riley*, 9 Wn. App. 2d 248, 255, 443 P.3d 827 (2019) (quoting *Boguch v. Landover Corp.*, 153 Wn. App. 595, 609, 224 P.3d 795 (2009)).

Then, the burden shifts to the nonmoving plaintiff, who must establish a prima facie case for each claim, showing how the evidence supports all of the essential elements. *Id.* To defeat summary judgment, it is not enough for the nonmoving plaintiff to offer speculative or argumentative assertions, opinions, or conclusory statements—they must offer specific, detailed, and disputed facts supported by the evidence. *See id.* "The nonmoving party cannot merely claim contrary facts and may not rely on speculation, argumentative assertions that unresolved factual issues remain, or on affidavits considered at face value." *Shoulberg v. Pub. Util. Dist. No. 1 of Jefferson County*, 169 Wn. App. 173, 177, 280 P.3d 491, *review denied*, 175 Wn.2d 1024 (2012).

If a plaintiff's "complete failure" to prove an essential element " 'renders all other facts immaterial' "—the plaintiff's claim cannot survive summary judgment. *Friends of Moon Creek v. Diamond Lake Improvement, Ass'n*, 2 Wn. App. 2d 484, 494, 409 P.3d 1084 (2018) (internal quotation marks omitted) (quoting *Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989)).

II.  NEGLIGENT INVESTIGATION

Stout argues that the superior court's dismissal of his negligent investigation claim was error mainly because he provided ample evidence that Felix and Gadwa made "falsehoods" during the investigation.  We disagree the superior court erred.

A.  STOUT'S BURDEN

In Washington, chapters 13.34 RCW and 26.44 RCW govern the duty to report child abuse and neglect and dependency actions, and together, seek to balance the need to protect the parental rights with the need to protect children from abuse and neglect.  *See H.B.H. v. State*, 192 Wn.2d 154, 164-65, 429 P.3d 484 (2018).  "These obligations are often in tension with each other." *Atkerson v. State*, 4 Wn.3d 307, 314, 562 P.3d 1256 (2025).

School employees are required under RCW 26.44.030(1)(a) to report any incidents where they may reasonably suspect a child is being abused or neglected to law enforcement or DCYF. Once a report is filed, DCYF or law enforcement must investigate.  RCW 26.44.050(1).

In addition to creating a duty for DCYF to investigate, a narrow cause of action for parents for negligent investigations is created by RCW 26.44.050.  *McCarthy v. County of Clark*, 193 Wn. App. 314, 328, 376 P.3d 1127, *review denied*, 186 Wn.2d 1018 (2016).  To prevail on a claim for negligent investigation, a parent must prove (1) DCYF conducted an " 'incomplete or

biased' " investigation that (2) was the proximate cause of the child being placed in a "harmful placement decision, such as removing the child from a nonabusive home, placing a child in an abusive home, or letting a child remain in an abusive home.' " *Atkerson*, 4 Wn.3d at 314 (internal quotation marks omitted) (quoting *Desmet v. Dep't of Soc. & Health Servs.*, 200 Wn.2d 145, 160, 514 P.3d 1217 (2022). Both elements are required; it is not enough for a parent to allege that a DCYF social worker's conduct fell below a reasonable standard of care or that they failed to follow proper investigative procedures. *Petcu v. State*, 121 Wn. App. 36, 59, 86 P.3d 1234, *review denied*, 152 Wn.2 1033 (2004).

Following a shelter care hearing, DCYF is also generally immune from liability to the extent that it is complying with court orders, including shelter care or other dependency orders. RCW 4.24.595(2). "[I]mmunity [is] applied only to acts performed to comply with *court orders*, not to the department's own investigation and determination of whether accusations were founded." *Atkerson*, 4 Wn.3d at 317 (emphasis added).

DCYF's liability is also limited during "emergent placement investigations." RCW 4.24.595(1); *Atkerson*, 4 Wn.3d at 315-16. An emergent investigation includes any determination that takes place *prior to* a shelter care hearing to remove a child from a parent, to leave a child with a parent, or to return a child to a parent. RCW 4.24.595(1); *Atkerson*, 4 Wn.3d at 316. For these emergent placement investigations, a parent must also prove an additional element, that DCYF acted with *gross negligence*. RCW 4.24.595(1). Thus, the level of negligence required to be shown, gross or simple, depends on whether DCYF's investigation is characterized as emergent or non-emergent.

Here, Stout's negligent investigation cause of action was premised on an emergent investigation. Throughout these proceedings, Stout has focused his allegations on DCYF's actions *prior to* the shelter care hearing on October 5. In his complaint, Stout clearly references the events of September 30 when he alleges that DCYF is liable for negligent investigation because they "failed to investigate" whether Stout had abused, neglected, or was incapable of caring for his children, "but nevertheless still removed the children from [his] home when they were perfectly safe with the Paternal Aunt." CP at 6. And in his response to DCYF's motion for summary judgment, Stout references only DCYF's conduct during the September 30 incident or the dependency petition—both of which occurred before the shelter care hearing—to support this negligent investigation claim.

Indeed, Stout's response to the summary judgment motion appeared to concede that the department's allegedly negligent investigation occurred before the shelter care hearing and that gross negligence must be shown.

> The State correctly identifies RCW 4.24.595(1) as limiting the State's liability in emergent placement investigations. . . . Here, a jury could find the Defendant social workers did not exercise even the slightest regard for accuracy or veracity as they conducted their investigation. Taken in a light most favorable to Mr. Stout, the evidence shows the caseworkers developed a bias against Mr. Stout early in their interaction with him. Early on in their time on Mr. Stout's property, the removal of the children was already a forgone conclusion. In light of the serious accusation that Mr. Stout had a gun, it was the failure of slight care to not further inquire of Linda McCona[]ghy-Fuhr as to whether he had a gun and what he had in his hand. Ms. Felix was content to falsely swear in order to "get" Mr. Stout and make sure he would not be a nurse.

CP at 344.

Moreover, throughout his opening brief to this court, Stout references only DCYF's actions leading up to the filing of the dependency petition on October 4, 2016—the day before

24

the shelter care hearing. *See, e.g.*, Br. of Appellant at 34 ("Mr. Stout's complaint, however, pertains to the lies told in the dependency *petition* as evidence of gross negligence." (emphasis added)), 35 ("In this case, the social workers failed to exercise even slight care to the specific hazard that could be created by a false dependency *petition*." (emphasis added)), 37 ("[T]he social workers were very deceptive in the declaration they provided to the court through their dependency *petition*." (emphasis added)), 41 ("[Stout's] claim . . . should survive summary judgment . . . because the social workers did not take even slight care to speak truthfully in their act of writing the dependency *petition* . . . ." (emphasis added)).

Accordingly, based on Stout's pleadings (including his opening brief to this court) and his representations to the superior court, we consider Stout's cause of action for negligent investigation to be rooted in an "emergent investigation."[5] *See* RCW 4.24.595(1). Thus, to survive summary judgment Stout must provide prima facie evidence that DCYF was grossly negligent. *Id.*

---

[5] For the first time in his reply brief to this court, Stout argues that a portion of his negligent investigation claim relates to a non-emergent investigation. Stout appears to broaden his negligent investigation claims to activities occurring after the October 5 shelter care hearing, arguing that the social workers failed to tell the court or further investigate McConaghy-Fuhr's assertions that she had not seen Stout with a gun on September 30. Thus, for this aspect of his claim, he contends that he must show only simple negligence.

But as shown above, Stout never articulated that any part of his cause of action was based on DCYF's conduct after the petition for the shelter care hearing. Stout's recharacterization of his claim as including actions taken after October 5 in his reply brief (apparently seeking a *simple* negligence standard) is too late for our consideration. *State v. Gantt*, 29 Wn. App. 2d 427, 439 n.6, 540 P.3d 845 (2024) (" '[A]n issue raised and argued for the first time in a reply brief is too late to warrant consideration.' ") (internal quotation marks omitted) (quoting *Norcon Builders, LLC v. GMP Homes VG, LLC*, 161 Wn. App. 474, 497, 254 P.3d 835 (2011))).

B. GROSS NEGLIGENCE

"Gross negligence" is " 'substantially and appreciably greater than ordinary negligence.' " *Peterhans v. Univ. of Washington*, 34 Wn. App. 2d 745, 752, 571 P.3d 322 (quoting *Nist v. Tudor*, 67 Wn.2d 322, 331, 407 P.2d 798 (1965)), *review denied*, 5 Wn.3d 1020 (2025). Thus, instead of showing that the defendant's conduct fell below the level of care exercised by a reasonably prudent person under the circumstances as one would in an ordinary negligence claim, a plaintiff claiming gross negligence must show that the defendant " '*substantially*' breached its duty by failing to act with even slight care." *Harper v. State*, 192 Wn.2d 328, 341, 429 P.3d 1071 (2018) (quoting *Nist*, 67 Wn.2d at 331). A failure to act with slight care does not mean there was a " 'total absence of care' " but that the level of care exhibited by the defendant was significantly less than when a defendant was merely negligent. *Id.* at 342 (quoting *Nist*, 67 Wn.2d at 331). Because this is a much higher bar, evidence of ordinary negligence is insufficient to make a prima facie claim for gross negligence. *Riley v. Iron Gate Self Storage*, 198 Wn. App. 692, 705, 395 P.3d 1059, *review denied*, 189 Wn.2d 1010 (2017).

Generally, the issue of whether a defendant breached its duty to act with slight care must be decided by a jury; however, courts may decide the issue on summary judgment " 'if reasonable minds could not differ.' " *Harper*, 192 Wn.2d at 341 (quoting *Hertog v. City of Seattle*, 138 Wn.2d 265, 275, 979 P.2d 400 (1999)). Our Supreme Court has given us a two-step process to evaluate gross negligence claims at summary judgment. *Id.* at 343. First, we must identify the specific "failure" or "the action that the plaintiff claims that the defendant should have taken but did not." *Id.* Second, looking at all of the evidence (including what the defendant failed to do and what they did), we must determine if the plaintiff provided substantial evidence that the

defendant failed to exercise slight care under the circumstances. *Id.* If reasonable minds would agree that the defendant exercised even slight care, summary judgment must be granted. *Id.* at 346.

Following this two-step process, first, we identify DCYF's alleged relevant failure. Based on Stout's claims, our analysis is centered on the alleged failure to conduct an honest investigation and submit an honest dependency petition about Stout's behavior and whether he posed a risk to the safety of his children. Second, we must look at the evidence and identify whether DCYF exercised at least slight care when it did so.

Here, Stout supports his contention that DCYF was grossly negligent by alleging the investigation and dependency petition were based on "a multitude of lies" told by social workers Felix and Gadwa. Br. of Appellant at 41.[6] He contends that "once [Felix and Gadwa] learned . . . that the allegations of the intake did not constitute abuse or neglect, they antagonized [him] by accusing him of intoxication, demanding to come into his home, falsely stating they did not need a warrant to come in his home, and refusing to leave his property." Reply Br. of Appellant at 11 (citations omitted).

---

[6] Specifically, Stout contends that the petition contained the following "falsehoods": (1) that Stout was drunk, (2) that Stout had been "screaming and acting hostile," (3) that Stout had given them permission to wait for law enforcement to arrive in his driveway, (4) that while Stout towed them off of his driveway that K.S. and H.S. were "huddled and cowering" next to a truck, (5) that after they moved their car to McConaghy-Fuhr's driveway Stout had approached them with a gun, and (6) that McConaghy-Fuhr had "c[o]me running down the driveway stating the children were safe in her home." Br. of Appellant 38, 41. Stout further argues that the petition also lied about what Cheri Jameson reported to Felix and Gadwa.

Stout asserts that because he is the nonmoving party, we must take his version of events "as fact." Br. of Appellant at 37; Reply Br. of Appellant at 10. This means, he contends, that we must take as fact, (1) he was not intoxicated, (2) he had not been drinking, (3) he did not tell Felix and Gadwa that he had planned to take K.S. to cheerleading practice, (4) he did not hit Felix and Gadwa's car when he backed out around them, (5) K.S. and H.S. had been "relieved" when Felix and Gadwa left, and (6) K.S. had told McConaghy-Fuhr that she was not afraid of her father, but the social workers were trying to say she was.[7] Reply Br. of Appellant at 11. Accepting these assertions as "fact," Stout argues one could reasonably infer that Felix and Gadwa were grossly negligent because they failed to exercise slight care and "intentionally sought to turn K.S. against her father." Reply Br. of Appellant at 12.

DCYF responds that "the record contains abundant evidence" that more than slight care was exercised during Felix and Gadwa's investigation and in the filing of the dependency petition. Resp't's Br. at 31. DCYF explains that Felix and Gadwa properly screened Roberts' report of abuse and proceeded, as required by law, to investigate it. They prudently interviewed K.S. at her school and only then decided to travel to Stout's property to investigate further. While at Stout's property, they clearly explained why they were there and photographed the broken glass and the bullet holes at the residence.

DCYF contends that any inaccuracies in the dependency petition would "[a]t most" amount to only simple negligence, not gross negligence. Resp't's Br. at 62. And even if DCYF's

___

[7] Stout contends that reliance on K.S.'s statement to McConaghy-Fuhr is permissible because it was an excited utterance.

"lies" are disregarded, its unchallenged allegations against Stout were sufficient to support its dependency petition and show that Felix and Gadwa exercised at least slight care. According to DCYF, it is undisputed that

> K.S. stated Stout and Par[é] were drinking alcohol the night of the gunshots; Stout minimized the gunshot incident when talking with the school counselor; K.S. was upset and scared to return home after school; Stout instructed K.S. and H.S. to tell the social workers they were not afraid; K.S. asked Felix not to leave her because K.S. did not want to be left alone with Stout; and that K.S. and H.S. were taken into protective custody following Stout's arrest on the day of the report.

Resp't's Br. at 33-34 (internal citations omitted). DCYF contends that based on these uncontested facts, as a matter of law, it was not grossly negligent for DCYF to file a dependency petition and remove K.S. and H.S. from Stout's care.

We agree with DCYF. The focus of the inquiry is on DCYF's knowledge and motivations, not Stout's subjective and conclusory interpretation of DCYF's motivations. Merely challenging the veracity of DCYF's subjective beliefs in a conclusory way does not create a genuine issue of material fact. Indeed, once Stout's subjective conclusory statements are peeled away from his factual statements, there is no genuine issue of fact about gross negligence, even construing the facts in a light most favorable to Stout.

An example of this distinction between Stout's subjective conclusions and factual allegations is seen by the issue of whether Stout had a gun when he approached Felix and Gadwa. Stout essentially claims that the fact he did not have a gun means that Felix and Gadwa were lying when they claimed that they saw him with one. But even if we accept as true that Stout did not have a gun, that is not dispositive on Felix and Gadwa's investigation. Felix and Gadwa confirmed that at that moment, they both thought that Stout had a gun (and even Stout

acknowledges that they appeared to have genuine fear of him when they sped off from McConaghy-Fuhr's driveway). And even if we accept as true that McConaghy-Fuhr told Felix and Gadwa that Stout did not have a gun, that also does not necessarily bear on Felix and Gadwa's belief that they had seen a gun or that they based the sworn dependency petition on that good faith belief. In the full context of the interaction, the fact we assume as true for the purposes of summary judgment (that Stout did *not* have a gun), does not make DCYF grossly negligent. As stated by DCYF, this was "at most" negligence. Resp't's Br. at 62.

Another example of this distinction between Stout's subjective conclusions (that are not taken as true) and his factual allegations (that are taken as true) is the issue of whether Stout was drunk. Stout argues that because we must take as true that he was not drunk, we must also take as true that Felix and Gadwa intentionally lied about their concerns about his drinking and created a vindictive plan to remove his children as a result. But, it does not necessarily follow even if Stout was not drunk, that we take, as true, the conclusory assertions that Felix and Gadwa lied or created a vindictive plan. Again, the question is not whether Stout *was* drunk, the question is whether DCYF's subjective motivations and objective actions were grossly negligent. And here, even assuming Stout was not drunk, the social workers also observed him smelling of alcohol, becoming agitated, and acting erratically. Even Stout admits he became angry, yelled at Felix (he admitted he told her to "shut her f***ing pie hole"), and dragged their state vehicle with a chain.

Yet another example is the issue of whether Stout's children were afraid of him. Construing the facts in his favor may mean taking as true that K.S. and H.S. were not actually afraid of Stout. But the question is what the social workers believed and the reasonableness of their actions under the circumstances. And for that question, the social workers observed the

children displaying behaviors that they reasonably thought showed the children were afraid. Gadwa, for example, observed what she described as both children acting afraid of Stout based on the faces they were making and "the way they twist[ed] their little hands." CP at 79. Again, even taking Stout's factual statements as true does not mean the social workers were lying.

That is not to say that the facts construed in Stout's favor are irrelevant to the question of DCYF's actions in the investigation and the petition. At a minimum, construing facts in Stout's favor means DCYF was wrong about some things, perhaps negligently so. And one might imagine that if there were no other indicators of DCYF's good faith in its investigation, Stout might have done enough to establish a prima facie case of gross negligence. However, here, there were many other, largely undisputed, indicators that could have caused Felix and Gadwa to believe that Stout had a gun, was intoxicated, and was someone who his children feared. These other indicators include being told there were guns in the household, that there was alcohol use the night before the incident, the body language of the children, and the intensity of the incident (including the aggressive towing of the state vehicle).

Viewed as a whole, Stout's facts, even construed in a light most favorable to him, do not lead to the conclusory assertions that Felix and Gadwa intentionally lied during the investigation or intentionally put "falsehoods" in the dependency petition. *See Shoulberg*, 169 Wn. App. at 177 (We are not obligated to give credence to "speculation, argumentative assertions that unresolved factual issues remain, or on affidavits considered at face value."). Thus, even viewing the evidence in the light most favorable to Stout, we hold that Stout has not established a prima facie case that DCYF committed gross negligence. Accordingly, his negligent investigation claim fails.

III.  MALICIOUS PROSECUTION

Stout argues that the superior court erred when it dismissed his three malicious prosecution claims.  He contends that Felix and Gadwa's "lies" in their reports to police, the dependency petition, and the administrative findings are sufficient to create an issue of fact precluding summary judgment, especially when combined with the testimony that Felix and Gadwa laughed about Stout losing his job as an LPN.  We disagree.

Malicious prosecution claims serve as a remedy for unjustifiably initiated civil or criminal matters.  *Clark v. Baines*, 150 Wn.2d 905, 911-12, 84 P.3d 245 (2004).  However, they are not generally favored in law.  *Rodriguez v. City of Moses Lake*, 158 Wn. App. 724, 728, 243 P.3d 552 (2010), *review denied*, 171 Wn.2d 1025 (2011).  "This is because an individual, 'who acts in good faith shall not be subjected to damages merely because the accused is not convicted.' "  *Id.* at 729 (internal quotation marks omitted) (quoting *Hanson v. City of Snohomish*, 121 Wn.2d 552, 557, 852 P.2d 295 (1993).  A lack of probable cause is an essential element for a civil claim of malicious prosecution.  *State v. Disney*, 199 Wn. App. 422, 429, 398 P.3d 1218 (2017).  And dismissal of the plaintiff's criminal case is "prima facie evidence" of a lack of probable cause.  *Id.*

However, the absence of probable cause alone is not enough to establish a case of malicious prosecution.  *Youker v. Douglas County*, 162 Wn. App. 448, 464, 258 P.3d 60, *review denied*, 173 wn.2d 1002 (2011).  Malice must also be shown—the plaintiff must demonstrate "affirmative acts disclosing at least some feeling of 'bitterness, animosity or vindictiveness towards the appellant.' " or "reckless disregard" on the part of the defendants.  *Id.* at 464 (internal quotation marks omitted) (quoting *Moore v. Smith*, 89 Wn.2d 932, 943, 578 P.2d 26 (1978)).

Here, in addition to the facts discussed above related to negligent investigation, Stout relies heavily on the testimony that Felix and Gadwa laughed at the idea of Stout losing his job as an LPN to show malice. Stout contends that Felix and Gadwa wanted to remove his children from his custody and turn them against him as retaliation for his behavior during the investigation. *See*, *e.g.*, Br. of Appellant at 13 (stating that the social workers "decided to remove the children because of their dispute with Mr. Stout"), 43 ("Once Mr. Stout made the social workers mad, it was a forgone conclusion in the social workers' minds that Mr. Stout's children would be taken."); Reply Br. of Appellant at 12 (stating that one could infer that the social workers lied because they "intentionally sought to turn K.S. against her father").

The State responds that Stout fails to show "how the social workers' laughter or any alleged 'enjoyment' reached the required level of bitterness, animosity, or vindictiveness required for malice." Resp't's Br. at 50. The State further argues that the prospect of Stout losing his job was "simply factual" given his profession as a nurse rather than a reflection of malice. Resp't's Br. at 51.

We agree with the State that Stout has not shown sufficient evidence of malice. Even construing the facts in a light most favorable to Stout, he has not done enough to make a prima facie showing of malice for at least two reasons. First, as noted above, most of his "facts" are actually not facts, but merely subjective conclusory assertions about DCYF's motivations that, for the same reason they are insufficient to show gross negligence, do not show malice.

Second, the testimony that Felix and Gadwa laughed falls short of showing the degree of behavior necessary for malice. It is undisputed that the interactions were tense on September 30. And even Stout acknowledged in his deposition that Felix and Gadwa were fearful of him. It

was, without question, unprofessional for Felix and Gadwa to laugh at the idea that Stout could have occupational consequences from the investigation. But context matters. One might imagine, under some circumstances, that laughing social workers could be evidence of malice. For example, if the facts showed that DCYF was repeatedly, with calm deliberation, expressing delight with damaging a person's occupation, malice might be the cause. But here, in the context of this extremely heated moment, Felix and Gadwa's single (and unprofessional) reaction, cannot reasonably be said to rise to the level of malice. Thus, because Stout cannot make a prima facie showing that DCYF or its employees acted with malice, his malicious prosecution claim fails.

IV. INTENTIONAL TRESPASS

Stout argues that the superior court erred in dismissing his claim for intentional trespass. We disagree.

To prove liability for intentional trespass, a plaintiff must prove that the defendant (1) intentionally, (2) invaded the plaintiff's interest in the exclusive possession of his property, (3) with the knowledge and reasonable foreseeability that the act would disturb the plaintiff's possession, and (4) caused actual and substantial damages. *Lavington v. Hillier*, 22 Wn. App. 2d 134, 149, 510 P.3d 373, *review denied*, 200 Wn.2d 1010 (2022).

Because a plaintiff is required to prove "actual and substantial damages," it is generally insufficient for a plaintiff to claim nominal damages. *Id.* at 153. But these damages are not limited to only physical damage to the property—they can also include emotional damages. *Id.* at 151-52. However, in order to meet the damages element, the plaintiff must provide evidence regarding these alleged damages. *See id.* at 149, 153-54.

Stout argues that his trespass cause of action is clearly viable and that DCYF's claim that Felix and Gadwa were not trespassers is "preposterous." Br. of Appellant at 51. He contends that the social workers were trespassing the moment he told them to leave. And he contends that their refusal to leave his property until he dragged them off (even leaving tire marks in the gravel) further shows that the trespass was "wil[l]ful," "adamant," and "unrelenting." Br. of Appellant at 52. Stout also claims that although it is "unclear what role the trespass of the social workers played in [his] resulting loss of relationship with his children," his damages were primarily emotional damages. Br. of Appellant at 52. According to Stout, a jury could find that Felix and Gadwa's trespass "became the catalyst" for the loss of his children and "all emotional damages that followed." Reply Br. of Appellant at 19.

DCYF responds that the record contains no evidence supporting damages connected to any trespass—either emotional or physical damages. DCYF argues that Stout even concedes that it is " 'unclear' " how the trespass caused him emotional damages. Resp't's Br. at 40. And for the alleged physical damage to his property, DCYF points out that Stout fails to connect the tire marks on the gravel and damage to his car's mirror to the alleged trespass. Resp't's Br. at 40 (quoting Br. of Appellant at 52).

We agree with DCYF. Even assuming that DCYF committed an intentional trespass, our review of the record shows that Stout has submitted no evidence that adequately supports a claim for related damages. As Stout himself concedes, there is no clear connection between the alleged trespass and any emotional damages. Similarly, Stout has provided no proof of physical damage connected to the alleged trespass. His statements of the "damage" are bare assertions, and he fails

to establish how they are permissible trespass-related damages.[8] *See Lavington*, 22 Wn. App. 2d at 153 (discussing damages for intentional trespass being related to the property, including costs for restoration and compensation for deprivation of exclusive use and possession, even if temporary). Because Stout has failed to adequately plead damages, the superior court did not err when it dismissed his trespass cause of action.

V. NEGLIGENT SUPERVISION

Stout argues that it was error for the superior court to dismiss his claim for negligent supervision. He argues that DCYF failed to adequately supervise Felix and Gadwa and that DCYF should be held liable for the social workers' intentional trespass of his property because it was not in furtherance of their positions as social workers.

Negligent supervision can be a viable cause of action to hold an employer liable for the actions of its employee. *LaPlant v. Snohomish County*, 162 Wn. App. 476, 479, 271 P.2d 254 (2011). But the acts must be committed "outside the scope of employment." *Id.* (emphasis omitted). Otherwise, the cause of action would be redundant with claims for vicarious liability. *See Earl v. Campbell*, 34 Wn. App. 2d 632, 647-59, 570 P.3d 392 (outlining multiple Washington cases that explained the reasoning behind the requirement to prove the employee was outside the scope of employment), *review granted*, 579 P.2d 797 (2025).

An employee acts outside the scope of their employment if their conduct " 'is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by

---

[8] Stout appears to contend that he suffered physical damages when his mirror broke on his car as he was forced to go around the state vehicle. But he makes no attempt to establish how this damage is related to his possessory interest in his property. *See Lavington*, 22 Wn. App. 2d at 153.

a purpose to serve the master.' " *Anderson v. Soap Lake Sch. Dist.*, 191 Wn.2d 343, 361-62, 423 P.3d 197 (2018) (internal quotation marks omitted) (quoting *Robel v. Roundup Corp.*, 148 Wn.2d 35, 53, 59 P.3d 611 (2002)). Further, if the employer concedes that an employee's actions were within the scope of employment "a claim for negligent hiring, training, and supervision is generally improper." *LaPlant*, 162 Wn. App. at 480.

Here, DCYF contends that Stout has no viable negligent supervision claim because Felix and Gadwa were not acting outside the scope of their employment during the September 30 incident on Stout's property. In fact, in its motion for summary judgment, DCYF filed a declaration that conceded that each social worker was acting *within* the scope of their employment. And DCYF contends that Stout cannot show that such a declaration from an employer is not dispositive on that question.

Stout, on the other hand, claims that the social workers were acting outside the scope of their employment because their job is, essentially, to protect children. And when they decided to remain on Stout's property notwithstanding his commitment to not leave until law enforcement arrived, they committed an intentional trespass and were clearly not acting with the intention to protect his children.

Even assuming that Stout can establish that the social workers were trespassing, his negligent supervision claim fails. DCYF conceded that Felix and Gadwa were acting within the scope of their employment, and Stout offers nothing to suggest this type of declaration is not binding on an employer. *See DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962) ("Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none.").

Accordingly, the superior court did not err when it dismissed Stout's claim for negligent supervision.

VI. INTERFERENCE WITH FAMILY RELATIONS

Stout also contends that the superior court erred when it dismissed his claim for interference with family relations. We disagree.

Tortious interference with family relations is known by different labels, including " 'alienation of affections of a minor child' " or " 'malicious interference with the parent-child relationship.' " *Evans v. Tacoma Sch. Dist. No. 10*, 195 Wn. App. 25, 36, 380 P.3d 553 (quoting *Waller v. State*, 64 Wn. App. 318, 338, 824 P.2d 1225 (1992)), *review denied*, 186 Wn.2d 1028 (2016). To prevail in such a claim, a plaintiff must prove: (1) a family relationship, (2) that the defendant wrongfully interfered with that relationship, (3) that the defendant's wrongful interference was done with "malice," (4) a causal connection between the defendant's conduct and the loss of affection, and (5) that the plaintiff suffered damages. *Grange Ins. Ass'n v. Roberts*, 179 Wn. App. 739, 765, 320 P.3d 77 (2013), *review denied*, 180 Wn.2d 1026 (1014).

In this context, "malice" requires the plaintiff to prove more than recklessness—they must prove that the defendant's interference was "unjustifiable" and that they *specifically intended* to cause the plaintiff to "lose the affection" of their family. *Babcock v. State*, 112 Wn.2d 83, 108, 768 P.2d 481 (1989) ("Malicious interference" refers to unjustifiable interference."), *recons. on other grounds*, 116 Wn.2d 596 (1991); *Grange*, 179 Wn. App. at 765 (quoting *Waller*, 65 Wn. App. at 339); *Strode v. Gleason*, 9 Wn. App. 13, 20, 510 P.2d 250 (1973) ("The maliciousness that need be shown is an unjustifiable interference with the relationship between the parent and the child.").

Stout contends that he readily meets the required showing of malice. He reiterates that the social workers' "lies" throughout the dependency petition and their laughter at the prospect of him losing his job "demonstrate[] a wish on the part of the social workers for Mr. Stout to be injured." Br. of Appellant at 48. He appears to allege that Felix and Gadwa intentionally did these acts based on their negative feelings towards him.

Stout's claim fails. As discussed above, Stout provides only conclusory statements to support his assertion that the social workers had any malicious intent when they conducted their investigation or filed the dependency petition. The social workers had many justifiable reasons to conduct their investigation and to file their dependency petition. They were required by law to respond to Roberts' report of suspected abuse and neglect. They also had reasonable fears for the safety of K.S. and H.S. when they observed Stout acting erratically and appearing to be intoxicated. Even accepting the facts in the light most favorable to Stout, the evidence does not establish a prima facie case that the social workers acted with a malicious unjustifiable intent for Stout to lose the affections of his children.

VII. OUTRAGE

Stout also argues that the superior court erred when it dismissed his claim for outrage, also known as intentional infliction of emotional distress, because "the social workers knew their false dependency petition would cause [him] to experience extreme emotional distress." Br. of Appellant at 2. We disagree.

To prevail in a claim for intentional infliction of emotional distress, a plaintiff must prove (1) that the defendant's conduct was extreme and outrageous, (2) the defendant intentionally or recklessly inflicted emotional distress onto the plaintiff, and (3) the plaintiff suffered actual

emotional distress as a result of the defendant's outrageous conduct. *Spicer v. Patnode*, 9 Wn. App. 2d 283, 292, 443 P.3d 801 (2019). " 'Although the three elements are fact questions for the jury, th[e] first element of the test goes to the jury only after the court determine[s] if reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability.' " *Id.* at 292-93 (internal quotations omitted) (alterations in original) (quoting *Robel*, 148 Wn.2d at 51). Insults, threats, annoyances, petty oppressions, or other trivialities are not enough to be considered extreme or outrageous conduct. *Id.* at 292.

Stout argues that "[t]he social workers, based upon their interaction with [him] that day, knew their false dependency petition would cause [him] to experience extreme emotional distress based on his frequent referral to his constitutional rights." Br. of Appellant at 61. He contends that Felix and Gadwa's lies caused him "a deep wound" to think that the government "can so easily make up lies about him and as a result, cause the removal of his children." Br. of Appellant at 61.

We are unpersuaded that the facts sufficiently support Stout's claim for outrage. As discussed above, his contention that Felix and Gadwa knowingly lied in the dependency petition is a bare assertion. In our review of the record, Felix and Gadwa's conduct falls short of being outrageous. They were required to investigate K.S.'s reports to her school counselor alleging a possibly unsafe environment. And even construing the facts in a light most favorable to Stout, Felix and Gadwa supplied evidence that they were still concerned about Stout's behavior and the safety of the children. And they were reasonably concerned about the idea of Stout driving with K.S. while potentially being intoxicated. Other than Stout's own bare and conclusory assertions,

there is no evidence that Felix or Gadwa acted in bad faith or with the intention of emotionally harming Stout. Thus, his claim for outrage fails.

CONCLUSION

Stout has failed to meet his burden of making out the prima facie elements for any of his claims even construing the facts in a light most favorable to him. Thus, the superior court did not err in granting summary judgment in favor of DCYF and dismissing his complaint. We affirm the superior court.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

MAXA, P.J.

CHE, J.